IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN DIVISION

**JUNE RODGERS**, individually and as administrator of the Estate of Christian Phillip Nolan Rodgers,

Plaintiff,

v.

**CHRISTOPHER JAMES CHRISTIE** and **CHRISTOPHER S. PORRINO**, in their individual and official capacities, and

**THE LAURA AND JOHN ARNOLD FOUNDATION,** and

**ANNE MILGRAM,**

Defendants.

Civil Action No. ____________

JURY TRIAL DEMANDED

**COMPLAINT FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF**

NOW COMES June Rodgers, as the administrator of the Estate of Christian Rodgers, and individually as Christian Rodgers's mother and survivor, and files this action under 42 U.S.C. § 1983 and state laws of New Jersey to vindicate her rights and the rights of her son under the Fourteenth Amendment of the Constitution of the United States and the Constitution of the State of New Jersey.

## PRELIMINARY STATEMENT

1.

Christian Phillip Nolan Rodgers, was fatally shot on the street in cold blood by a man released just days earlier on New Jersey's "Bail Reform" initiative. Jules Black, the man arrested and charged with Mr. Rodgers murder, had been arrested on April 5, 2017 by New Jersey State Police. That arrest stemmed from charges that Black, a convicted felon, was carrying a 9mm pistol in his car during a traffic stop. Black was released after that arrest without having to post bond and with zero accountability due to the New Jersey "Bail Reform" initiative, championed and passed by Governor Christie. Black shot Rodgers 22 times.

2.

The Criminal Justice Reform Act ("CJRA"), passed in 2014, requires courts and prosecutors to use a "scoring system" known as the Public Safety Assessment ("PSA"), which was developed by the Laura and John Arnold Foundation ("Arnold Foundation" or "Arnold"). Instead of setting bail, judges are—by law—required to consider and exhaust a laundry list of other conditions of release before even considering bail, and the judges' decisions are required to be based upon the PSA. The problem is, when the PSA came into effect in January 2017, it didn't work, and throngs of violent criminals were released into

the streets of New Jersey's neighborhoods. Rodgers was but one victim of Christie's so-called "progress."

3.

Christie claims the CJRA is designed to keep people out of jail because they are poor and cannot afford bail, but in reality, Christie's goal was to save money on the costs of incarceration in the state. While the costs of incarceration are high, and the demand for reform is nearly universal, to knowingly employ a system with dangerous risks that would impact—and did impact—the lives of 8.9 Million people who live in the state of New Jersey was unconscionable. Christie and Porrino's actions amounted to deliberate indifference of June Rodgers's substantive due process rights guaranteed by the Fourteenth Amendment, including the right to companionship with her son. Governor Chris Christie and Attorney General Porrino knew that by using the new PSA system the number of criminals on the street would skyrocket—but Christie and Porrino disregarded that risk because they wanted to save money (and gain political traction to aid in various campaigns). As a direct result of Christie and Porrino's deplorable apathy, Christian Rodgers was fatally shot 22 times by a man who would have been locked up but for Christie and Porrino's use of the deadly "public safety" system, based upon this flawed PSA.

4.

Judge Ernest Caposela, who helped implement the use of the PSA in the state, claims that "we did not institute criminal justice reform to put bail bondsmen out of business and to empty out the jails, we did it to respect the presumption of innocence and design a system that is fair and honest." But there was nothing fair about Christian Rodgers being shot 22 times in cold blood by a villain that should have been behind bars. It isn't good enough to have positive intentions, and both Christie and Porrino have a responsibility to protect and defend the Constitutional rights of the citizens of New Jersey, including June Rodgers and her son.

5.

Rodgers was African American, and it is no coincidence that the tragic and violent end of his life occurred in a predominantly African American neighborhood. In New Jersey, African American residents are incarcerated at a rate ***twelve times*** that of white residents, despite comprising only 15 percent of the population, and thus releasing tens of thousands of defendants into communities by using the fatally flawed PSA tool impacted African American neighborhoods at an unprecedented scale of magnitude. Christie knew this would happen, and he let it happen. Christie's disparate treatment of African Americans is no secret to those paying attention. As a result, New Jersey Bail

reform created a system where African Americans in New Jersey are placed at a much higher risk of crime being perpetrated against them, as dangerous and violent offenders are cut loose from jails and shoved into communities where innocent people suffer, just like Christian Rodgers. In a sick twist, Christie's Bail Reform, in the name of helping minority communities, actually makes those communities more dangerous and is eliminating bail bond companies in New Jersey altogether—a significant number of which are owned by African Americans.

6.

The PSA system was developed by the Laura and John Arnold Foundation, which lobbied for its use and continue to parade its positive "results" around the country. The PSA that Arnold designed fails every test for safety, and Arnold failed to mention the extreme dangers that its PSA product would and does present to those who use it. And thanks to considerable lobbying efforts by Arnold Foundation and its Vice President of Criminal Justice and former Attorney General of New Jersey, Anne Milgram (the PSA's chief architect), the PSA is now forced onto New Jersey residents by law in the CJRA. Placing this product into New Jersey communities and the resulting brutal murder of Christian Rodgers make Arnold liable as well. As such, June Rodgers,

as Christian's survivor and as the administrator of his estate, is pursuing all available remedies against these Defendants.

## JURISDICTION AND VENUE

7.

Jurisdiction is proper under 28 U.S.C. § 1331 and 1343(a)(4), as well as under 42 U.S.C. § 1983. And Venue is proper under 28 U.S.C. § 1391(b) and on the supplemental jurisdiction of this Court to adjudicate claims arising under state law pursuant to 28 U.S.C. § 1367(a).

## RELEVANT FACTS

### I. The Parties

#### A. June Rodgers, Plaintiff

8.

June Rodgers is the surviving mother of Christian Rodgers, who was killed by Jules Black after he was released under the CJRA. Ms. Rodgers is suing on her own behalf and as the administrator of Christian Rodgers's estate.

#### B. Christopher James Christie, Defendant

9.

Christopher James Christie is the Governor of New Jersey, and the state's chief decision-maker. He can be served personally at his place of business.

**C. Christopher S. Porrino, Defendant**

10.

Christopher S. Porrino is the Attorney General of the state of New Jersey who is charged with executing the laws of the state, including the CJRA and its PSA. He can be served personally at his place of business.

**D. Arnold Foundation and Anne Milgram, Defendants**

11.

Laura and John Arnold Foundation is a philanthropic organization incorporated in Houston, TX and doing business in the state of New Jersey. Arnold designed the PSA and provided/provides it to New Jersey for determining the release of incarcerated criminal defendants. Arnold can be served at the address of its registered agent as provided to the Texas Secretary of State.

Anne Milgram was the Vice President of Criminal Justice policy with the Laura and John Arnold Foundation, chief architect of the PSA, and is the former Attorney General of New Jersey

**II. Appointment of Personal Representative of Probate Estate and Issuance of Letters of Administration**

12.

On April 9, 2017, Christian Rodgers, a resident of Cumberland County, New Jersey, died.

13.

In July of 2017, the Surrogate Court of Cumberland County, New Jersey appointed June Rodgers as Personal Representative of Mr. Rodgers's probate estate.

14.

The Surrogate Court issued Letters of Administration to Ms. Rodgers.

## III. A History of Arnold's PSA assessment tool

15.

Prior to the passage of the CJRA, Arnold Foundation designed an algorithm for the specific purpose of replacing monetary bail with a "risk assessment" tool. This algorithm was used to create its own Public Safety Assessment tool (PSA) to introduce to jurisdictions across the United States.

16.

In 2015, after two years of testing, the formula, developed at a cost of $1.2 million by the Laura and John Arnold Foundation, rolled out to multiple jurisdictions.

17.

Anne Milgram, the vice president for criminal justice for the Arnold Foundation and the former attorney general of New Jersey, helped push New Jersey to adopt the formula.

18.

For several years, the Arnold Foundation lobbied New Jersey legislators and Governor Chris Christie to adopt its PSA.

19.

After years of lobbying efforts, the Arnold Foundation got what they wanted and Governor Chris Christie and Attorney General Chris Porrino agreed to adopt Arnold Foundation's PSA tool whole cloth in the state of New Jersey and use it as the motherboard of the CJRA.

20.

The CJRA was written specifically for the application of Arnold Foundation's PSA to all eligible pretrial criminal defendants.

## IV. <u>The CJRA and its mandated use of the PSA</u>

21.

In 2012, Governor Christie called for a state constitutional amendment to reverse New Jersey's historic bail practice and permit pre-trial detention of defendants deemed likely to commit future crimes.

22.

New Jersey's Chief Justice then established and chaired the Joint Committee on Criminal Justice, which included members from all three branches of state government. In March 2014, the committee produced a report

recommending that the state authorize pre-trial detention based on a defendant's perceived dangerousness and that the state replace the traditional system of release on monetary bail with a new "risk-based instrument" that would "aid judges as they craft conditions of release … like electronic monitoring, house arrest, and reporting." N.J. Judiciary, Report of the Joint Committee on Criminal Justice 2-3 (Mar. 10, 2014), available at http://bit.ly/2pyNFUV ("Joint Committee Report").

23.

Soon after publication of the Joint Committee Report, the New Jersey legislature passed (in a special session, through procedurally deficient mechanisms) and Governor Christie signed the CJRA, which dramatically changed the state's pretrial detention and release procedures, largely in keeping with the committee's recommendations. See P.L. 2014, c.31, §1 (codified at N.J.S.A. 2A:162-15 et seq.).

24.

The CJRA creates a five-stage, hierarchical process for courts to follow in making pre-trial custody determinations for defendants charged with offenses through a complaint-warrant. N.J.S.A. 2A:162-16d(1); see State v. Robinson, No. 078900, 2017 WL 1908548, at *6 (N.J. May 10, 2017) (describing this "hierarchy").

25.

*First*, the court "shall order" the pre-trial release of the defendant on personal recognizance or execution of an unsecured appearance bond (in essence, a promise to appear) when the court finds that such a release would "reasonably assure the eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, and that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process." N.J.S.A. 2A:162-17a.

26.

*Second*, if the court finds at stage one that release on personal recognizance or an unsecured appearance bond will not provide the requisite assurance, the court "may order" pre-trial release subject to the conditions that the defendant "not commit any offense during the period of release … avoid all contact with an alleged victim of the crime … [and] avoid all contact with" witnesses who may testify concerning the offense. N.J.S.A. 2A:162-17b(1).

27.

The court may then add "the least restrictive condition, or combination of conditions, that the court determines will reasonably assure the eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, and that the eligible defendant will not

obstruct or attempt to obstruct the criminal justice process." N.J.S.A. 2A:162-17b(2); see Robinson, 2017 WL 1908548 at *6. Those conditions "may include," inter alia:

- remaining "in the custody of a designated person";
- restrictions "on personal associations, place of abode, or travel";
- reporting "on a regular basis to a designated law enforcement" or other government agency;
- complying "with a specified curfew";
- refraining from possessing a firearm;
- undergoing medical or psychological treatment;
- returning "to custody for specified hours following release for employment, schooling, or other limited purposes";
- placement "in a pretrial home supervision capacity with or without the use of an approved electronic monitoring device," including at the defendant's expense; and
- "any other condition" necessary to provide the requisite assurances.

N.J.S.A. 2A:162-17b(2).

28.

*Third*, if the court "does not find, after consideration" at stage two of all the conditions described above that release subject to any combination of these

conditions "will reasonably assure the eligible defendant's appearance in court when required," the court then, and only then, "may order the pretrial release of the eligible defendant on monetary bail." N.J.S.A. 2A:162-17c(1). In other words, "[m]onetary bail may be set for an eligible defendant only when it is determined that no other conditions of release will reasonably assure the eligible defendant's appearance in court when required." N.J.S.A. 2A:162-15 (emphasis added).

29.

In addition, the court "may only impose monetary bail … to reasonably assure the eligible defendant's appearance." N.J.S.A. 2A:162-17c(1). "The court shall not impose the monetary bail to reasonably assure the protection of the safety of any other person or the community or that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process, or for the purpose of preventing the release of the eligible defendant." Id.

30.

*Fourth*, if the court "does not find, after consideration" that either nonmonetary conditions alone (as assessed at stage two) or monetary bail alone (as assessed at stage three) will provide the requisite assurances, the court may order pre-trial release subject to a combination of non-monetary conditions and monetary bail. N.J.S.A. 2A:162-17d(1).

31.

*Finally*, if the prosecutor seeks pre-trial detention and the court finds by "clear and convincing evidence that no amount of monetary bail, non-monetary conditions of pretrial release or combination of monetary bail and conditions would reasonably assure the eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, and that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process," the court can order pre-trial detention. N.J.S.A. 2A:162-18a(1).

32.

***At every stage***, the process includes consideration of the result of a statutorily mandated "pretrial risk assessment" conducted by the Pretrial Services Program for the purpose of making recommendations to the court concerning an "appropriate pretrial release decision." N.J.S.A. § 2A:162-25(b).

33.

The "pretrial risk assessment" must be conducted using "a risk assessment instrument approved by the Administrative Director of the Courts" that purportedly meets certain requirements, including that the instrument be "objective, standardized, and developed based on analysis of empirical data and risk factors relevant to the risk of failure to appear in court when required and

the danger to the community while on pretrial release." N.J.S.A. § 2A:162-25(c)(1).

34.

The requirements of the risk assessment instrument were written specifically based on Arnold Foundation's description of the PSA it designed.

35.

Under the CJRA, the risk assessment must be completed and presented to the court so that the court can, "without unnecessary delay, but in no case later than 48 hours after the eligible defendant's commitment to jail, make a pretrial release decision." N.J.S.A. § 2A:162-25(b).

36.

Under the new bail system, judges are required to base their decisions on the PSA scores.

37.

As part of the CJRA's implementation, New Jersey's courts are instructed in their own rules to prioritize non-monetary conditions of pre-trial release over monetary bail. Under the New Jersey Rules of Court, a court has ***no authority to consider monetary bail unless and until it considers and rejects non-monetary pre-trial release options based on the PSA***. See, e.g., Rule 3:26-1(a)(1) ("[M]onetary conditions may be set for a defendant but only when it is

determined that no other conditions of release will reasonably assure the defendant's appearance in court when required.").

38.

In November 2014, New Jersey voters approved a constitutional amendment replacing the centuries-old guarantee that "[a]ll persons shall … be bailable by sufficient sureties," except in some capital cases, with a provision that "[p]retrial release may be denied to a person if the court finds that no amount of monetary bail, non-monetary conditions of pretrial release, or combination of monetary bail and non-monetary conditions would reasonably assure the person's appearance in court when required, or protect the safety of any other person or the community, or prevent the person from obstructing or attempting to obstruct the criminal justice process." N.J. Const. art. I, §11.

39.

In sum, the CJRA "changed the landscape of the State's criminal justice system," replacing a system that guaranteed a monetary bail determination to all defendants except those in certain capital cases with a system that authorizes pretrial detention based on perceived dangerousness and imposition of severely restrictive conditions such as electronic monitoring and home detention without any opportunity to post monetary bail. Robinson, No. 078900, 2017 WL 1908548, at *4.

40.

Defendant Porrino has confirmed that the "Bail Reform Law is intended to end New Jersey's historical reliance on monetary bail." Christopher S. Porrino, Attorney General of New Jersey, Attorney General Law Enforcement Directive No. 2016-6, at 55 (Oct. 11, 2016), available at http://bit.ly/2pjHDeP.

41.

According to Defendant Porrino, under the CJRA, monetary bail is "a last resort" that is reserved only for "limited situations"—i.e., "when the court finds that release on non-monetary conditions will not reasonably assure the defendant's appearance in court when required." Christopher S. Porrino, Attorney General of New Jersey, Attorney General Law Enforcement Directive No. 2016-6, at 55 (Oct. 11, 2016), available at http://bit.ly/2pjHDeP. In other words, "there shall be a presumption against seeking monetary bail." Id. at 56. The CJRA clearly limits consideration of monetary bail, but by reserving it for the most difficult pretrial release situations the CJRA, and through their advocacy Christie and Porrino, acknowledge the superior effectiveness of monetary bail in guaranteeing the appearance of criminal defendants.

## V. The PSA's effect, in numbers

42.

New Jersey's new pre-trial release and detention procedures under the CJRA took effect January 1, 2017.

43.

Although New Jersey appears not to have issued official statistics on the number of defendants released on monetary bail under the new law, one prominent newspaper reported that of "the 3,382 cases statewide that were processed in the first four weeks of January, judges set bail only three times." Lisa W. Foderaro, New Jersey Alters its Bail System and Upends Legal Landscape, N.Y. Times (Feb. 6, 2017), http://nyti.ms/2llmeMR. Thus, while bail remains a theoretical option, "the reality is that judges have nearly done away with it." Id.

44.

According to the state's preliminary statistics, in the first six months of 2017, New Jersey courts granted 3,307 pre-trial detention motions from prosecutors—a procedural mechanism that allows detention without the consideration of bail and that did not exist before the new law. N.J. Courts, Criminal Justice Reform Statistics: January 2017-June 2017, Chart A, http://bit.ly/2q68u9Y.

45.

According to the same statistics, approximately 18,000 individuals were released subject to non-monetary conditions in the first six months of 2017. Id.

46.

***In Cumberland County, between January 1 and June 1, 2017, 2,195 defendants were released into the community, while only 287 received detention.***

47.

Between January 1, 2017 and June 1, 2017, the overall pretrial jail population decreased by 19.8% state-wide, from 7,337 to 5,884 pretrial detainees. In Cumberland County, where Rodgers and his family live, the decrease was 24.3%. While reducing jail populations is a noble goal, this case underscores that sometimes pretrial detention keeps us all safe. Had Jules Black been detained as a felon carrying a gun, Christian Rodgers would be alive today.

## VI. The PSA and the Decision-Making Formula

48.

Arnold Foundation's PSA gives defendants two scores — one for their likelihood of committing a crime and one for their risk of failing to appear in court. Both are scaled 1 to 6, with 1 being the lowest risk and 6 being the highest risk.

49.

Arnold Foundation claims that the PSA flags those with an elevated risk of violence.

50.

Certain factors used to produce each PSA score, and these factors are plugged into a Decision-Making Formula ("DMF"). According to Arnold Foundation, these factors are:

- Whether the current offense is violent
- Whether the person had a pending charge at the time of the current offense
- Whether the person has a prior misdemeanor conviction
- Whether the person has a prior felony conviction
- Whether the person has prior convictions for violent crimes
- The person's age at the time of arrest
- How many times the person failed to appear at a pretrial hearing in the last two years
- Whether the person failed to appear at a pretrial hearing more than two years ago
- Whether the person has previously been sentenced to incarceration.

51.

A juvenile record is not included in calculating the scores.

## VII. The Problem: By using the PSA, droves of violent criminals were cut loose into New Jersey's communities on Christie and Porrino's watch

52.

Law enforcement professionals across the state of New Jersey have expressed their serious concerns about the dangers of this PSA.

53.

Under the current DMF, the charges of escape (N.J.S.A. 2C:29-S.a), murder, aggravated manslaughter, or manslaughter (N.J.S.A. 2C:11-3, 11-4), aggravated sexual assault or sexual assault (N.J.S.A. 2C:14-2a, b, c.l), and robbery or carjacking (N.J.S.A. 2C:15-1, 15-2) will result in an automatic recommendation from Pretrial Services of "No Release Recommended"—regardless of an individual defendant's PSA scores.

54.

In addition, if the PSA resulted in a New Violent Criminal Activity ("NVCA") flag and the current charge is violent, the Pretrial Services recommendation also will be against release.

55.

Much of the criticism from law enforcement of the PSA and DMF has focused on cases involving weapons—predominantly firearms—particularly cases in which a defendant has a prior conviction for one or more specified offenses that make him/her a "certain person not to possess firearms" under

N.J.S.A. 2C:39-7b and those charges which subject a defendant to the mandatory sentencing provisions of the Graves Act, N.J.S.A. 2C:43 - 6c.

56.

The PSA's risk factors and formula and the DMF undervalue the danger posed by defendants in Graves Act cases involving unlawful possession of a firearm (N.J.S.A. 2C:39-5), possession of a firearm for an unlawful purpose (N.J.S.A. 2C:39-4a1), possession of a firearms in the course of committing a CDS distribution offense (N.J.S.A. 2C:39-4.1a), and/or certain persons not to have firearms (N.J.S.A. 2C:39-7b).

57.

Under the current system, none of these charges—absent a significant prior criminal history or an additional qualifying charge— triggers a NVCA flag or a Pretrial Services recommendation against a defendant's release.

58.

In the case of State v. Shakor Twitty (W-2017-000159-1602 Passaic), the defendant fled an area which police were canvassing after a burglary. While fleeing, the defendant discarded a backpack that he had in his possession. The backpack was recovered, and a .45 caliber Ruger semiautomatic handgun and a high capacity magazine were found inside. The defendant was charged with, among other offenses, Possession of a Weapon for Unlawful Purpose (N.J.S.A.

2C:39-4a1), Possession of Prohibited Weapons and Devices -Large Capacity Magazine (N.J.S.A. 2C:39-3j), Unlawful Possession of a Weapon (N.J.S.A. 2C:39-Sbl), and Certain Persons Not to Have Weapon (N.J.S.A. 2C:39-7b1).

59.

The defendant's PSA scores were FTA 3, NCA 3 with no NVCA flag.

60.

The Pretrial Services recommendation was "Release with Conditions — Monthly Reporting," and the judge so ordered.

61.

In State v. Austin Chaoya (W-2017-000093-1607 Passaic), the defendant pointed a handgun at the victim (the boyfriend of his step-daughter) while stating "I have this for you." The defendant was charged with Aggravated Assault —Knowingly Pointing a Firearm at Another (N.J.S.A. 2C:12-1b4), Terroristic Threats (N.J.S.A. 2C:12-3b), Possession of a Weapon for an Unlawful Purpose (N.J.S.A. 2C:39-4a1) and Unlawful Possession of a Weapon without a Permit (N.J.S.A. 2C:39-Sbl).

62.

The PSA scores were FTA 2, NCA 3, with no NVCA flag. The recommendation of Pretrial Services was "Release with Conditions —Monthly Reporting."

63.

The judge accepted Pretrial Services recommendation and ordered monthly telephonic reporting.

64.

In State v. Kenneth Price (W-2017-000591-1608 Passaic), the defendant was observed by undercover officers operating a motor vehicle with dark tinted windows and no front license plate in a high crime area in Paterson. The vehicle was stopped, and multiple glassine wax folds were observed on back seat. The defendant was ordered out of the vehicle, and he admitted to having a weapon (a handgun loaded with hollow point bullets) in his possession. An occupant of the vehicle admitted that he visited Paterson for the purpose of buying heroin. The defendant was charged with Possession of a Weapon for an Unlawful Purpose (N.J.S.A. 2C:39-4a1), Unlawful Possession of a Weapon (N.J.S.A. 2C:39-Sbl), and Prohibited Weapons and Devices (N.J.S.A. 2C:39-3f1).

65.

The defendant's PSA scores were FTA 1, NCA 1, with no NVCA flag.

66.

The judge ordered defendant released on his own recognizance in accordance with the Pretrial Services recommendation.

67.

In the each of the above matters, the State—despite the obvious severity of the conduct—did not file motions for pretrial detention because, according to Elie Honig, Director of the Division of Criminal Justice for the Defendant Attorney General, "in those cases, the low PSA scores and Pretrial Services recommendations for release posed significant practical obstacles to detention."

68.

In another case, Anishalee Cortes, 22, went to a Newark police station at 3 a.m. on April 8, 2017 to report Dominick Richards, 49, had broken into her home in Newark and assaulted her at gunpoint. Officers arrested Richards at his home and seized a Glock handgun, where after he was charged with aggravated assault with a firearm, unlawful possession of a weapon, possession of a weapon for an unlawful purpose, criminal restraint risking seriously bodily injury to the victim, criminal trespass, and a disorderly persons offense.

69.

The Essex County Prosecutor's Office on April 10, 2017 filed a motion for pre-trial detention of Richards, but considering Richards's low PSA score, Judge Alfonse Cifelli denied that motion on April 13, and Richards was released from jail the same day.

70.

Richards killed Cortes in his driveway two months later, and then he killed himself.

71.

In another case, on January 19, 2017 Christopher Wilson was arrested in Little Egg Harbor, NJ after authorities say he tried to get a 12-year-old girl to perform sexual favors for him by offering her a gaming system. He was also convicted in 2010 of attempted sexual assault and endangering the welfare of a child.

72.

Wilson too was given a low score in the PSA.

73.

At a detention hearing on January 25, Judge Wendel E. Daniels found no reason for Wilson to be detained, but simply ordered him to stay away from that particular 12-year-old girl and to wear a GPS bracelet.

## VIII. The Slaying of Christian Rodgers by Jules Black

74.

On April 5, 2017, Jules Black was arrested by New Jersey State Police.

75.

That arrest stemmed from charges that Black, a convicted felon, was carrying a 9mm pistol in his car during a traffic stop.

76.

Black has been a guest of the county jails in New Jersey 28 times, dating back to 2004.

77.

Black has had multiple felony convictions on various charges, including Resisting Arrest, Manufacturing Distribution of Drugs (Heroin/Meth – 1.5 years in prison), Burglary/Breaking Entering, Eluding Police Officers, Hindering Apprehension, and Possession and Distribution in a School Zone.

78.

Under New Jersey's CJRA, Mr. Black was assigned a score using the Arnold Foundation's PSA predicting the likelihood that he will commit a new crime if released pending trial.

79.

The next day, as a result of this score, Black was released back into the Millville community by Superior Court Judge Cristen D'Arrigo.

80.

On April 9, 2017, Christian Phillip Nolan Rodgers was shot to death 22 times by Jules Black while walking down the street in Vineland, NJ, a city adjacent to Millville.

81.

***When Police arrived on the scene, officers saw blood on the ground and followed the trail to the backyard of 1018 East Chestnut Ave., where they found Rodgers dead.***

82.

Rodgers suffered agonizing pain and emotional distress as he died.

83.

Rodgers was 26 years old at the time of his death and is survived by his mother.

84.

Black is now charged with the murder of Rodgers. His charges include first-degree murder, second-degree possession of a weapon for an unlawful purpose, and second-degree unlawful possession of a weapon.

## IX. Porrino back-peddles (too late)

85.

Approximately six weeks after Rodgers's murder, Defendant Attorney General Porrino apparently recognized that the PSA was so obviously flawed—producing fatal results—Defendant Porrino released new guidelines for when prosecutors should seek to detain defendants before trial.

86.

The amended rules Porrino issued direct prosecutors to push for detention more frequently in a number of cases, such as for sex offenders, ***for people who commit crimes in which a gun is used, and for those with a history of being a threat to public safety.***

87.

Porrino's office said the new, stronger guidelines should better ensure that dangerous and recidivist criminals are kept behind bars while awaiting trial.

88.

Elie Honig, director of the state Division of Criminal Justice, said in a statement: "These revisions to our law enforcement directive reflect a renewed confidence that our new system enables us to protect the public by detaining the most dangerous offenders, while avoiding the costs, both fiscal and social, of warehousing indigent non-violent offenders in jail pending trial."

**X. <u>Arnold Foundation's responsibilities under strict liability and duties as manufacturers of the PSA</u>**

89.

Arnold Foundation was the designer and manufacturer of the PSA tool, the product that was used in New Jersey at all relevant times to this Complaint.

90.

The intended purpose of the Arnold Foundation's PSA was to cause judges to release pretrial defendants from jail based on a risk assessment of the danger that a released defendant would be to the community.

91.

As the manufacturer of the PSA, Arnold Foundation was required, subject to strict liability, to design its PSA tool so that it would be reasonably fit, suitable or safe for its intended purpose. N.J. Stat. Ann. § 2A:58C-2.

92.

As the manufacturer of the PSA, Arnold Foundation also had a *duty* to design its PSA tool so that it would be reasonably fit, suitable or safe for its intended purpose.

93.

Arnold Foundation failed to design its PSA product so that it would be fit, suitable, or safe for its intended purpose, as evidenced by the release of violent

defendants into the community, resulting in, inter alia, the vicious murder of Christian Rodgers.

## XI. Christie and Porrino's knowledge of the particular risk to Christian and June Rodgers's predominantly African American neighborhood

94.

As Governor of New Jersey since 2010, Christie knew, at all relevant times to this Complaint, that there is a high ratio of African American to White pretrial criminal defendants that get incarcerated in New Jersey (12-1, according to a study released in 2016). See The Color of Justice: Racial and Ethnic Disparity in State Prisons, The Sentencing Project, 2016. Accessible at http://www.sentencingproject.org/wp-content/uploads/2016/06/The-Color-of-Justice-Racial-and-Ethnic-Disparity-in-State-Prisons.pdf.

95.

As Attorney General of New Jersey since 2016, Porrino also knew, at all relevant times to this Complaint, that there is a high ratio of African American to White pretrial criminal defendants that get incarcerated in New Jersey. See Id.

96.

As Governor of New Jersey since 2010, Christie knew, at all relevant times to this Complaint, that in New Jersey, like much of the country, the racial makeup of its neighborhoods is clustered geographically, producing, *inter alia*,

predominantly African American neighborhoods. See, e.g., This Map Shows the Racial Makeup of Every Block in N.J. NJ Advance Media, 2015. Accessible at http://www.nj.com/news/index.ssf/2015/10/this_map_shows_a_racial_breakdown_of_every_person.html.

97.

As Attorney General of New Jersey since 2016, Porrino also knew, at all relevant times to this Complaint, that in New Jersey, like much of the country, the racial makeup of its neighborhoods is clustered geographically, producing, *inter alia*, predominantly African American neighborhoods. See Id.

98.

Christie further knew that when the PSA was implemented, the numbers of African American defendants who would be released would be much higher than the number of White defendants, and that the majority of these African American defendants would be released into predominately African American neighborhoods.

99.

Porrino further knew that when the PSA was implemented, the numbers of African American defendants who would be released would be much higher than the number of White defendants, and that the majority of these African

American defendants would be released into predominately African American neighborhoods.

## XII. Chris Christie's history of disparate treatment of African Americans motivating his policies

100.

Since becoming Governor, Christie has overseen a state that has the largest disparity in the rate of which African Americans are incarcerated of any other state in the country. In New Jersey, blacks are incarcerated at a rate of twelve to one over whites.

101.

For years, beginning in 2010 and up through 2017, Christie has pushed a hostile agenda towards funding public education in predominantly African American communities, as evidenced by his relentless efforts to break with 30-years of New Jersey Supreme Court precedent to freeze state aid to special-needs school districts (which he calls "failure factories") and use his new "fairness formula" that would provide the same amount of money for every public-school pupil in the state.

102.

Fully armed with the statistics in his state that demonstrate that under-aided schools are predominantly made up of African American children, Christie pushed his "fairness formula" and advocated for eliminating funding to

thousands of African American inner-city youngsters while offering an enormous windfall to their wealthier, predominantly White neighbors in the suburbs.

103.

In July 2016, Christie vetoed a long-awaited law that would have eliminated the "Family Cap" on welfare recipients, claiming that it was unfair to non-welfare recipients who do not receive increased income when they have children. Christie knew that research has repeatedly found that family caps don't serve much purpose other than increasing hardship for already poor families. Fully armed with the knowledge that the majority of welfare recipients in his state are African American, Christie chose to effectively punish African American families for having more children.

**COUNT I**

**DELIBERATE INDIFFERENCE IN VIOLATION OF FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS RIGHTS UNDER 42 U.S.C. § 1983**

104.

Plaintiff hereby incorporates facts 1 through 98 to support this Count I.

105.

Based on the incorporated facts, Defendants Christie and Porrino knew, as the leaders of the state of New Jersey for many years, that droves of violent

offenders would be released once the PSA was implemented under the CJRA, and they knew that this would create a substantial—outrageous—risk of serious harm to the residents of New Jersey. Due to the well-known fact that there is a 12-1 ratio of African American to White pretrial criminal defendants that get locked up in in New Jersey in the first place, and that Christie and Porrino knew that racial demographics in New Jersey reflect that a disproportionately high number of African American defendants would return to predominantly African American neighborhoods when released, Christie knew that the outrageous risk would be borne by predominantly African American neighborhoods, in particular.

106.

Despite this knowledge, Defendants installed the PSA into the criminal justice system of the state, and those droves of violent defendants were let loose into New Jersey's many communities. Despite three months of data between January 1 and April 9, Christie and Porrino ignored the risk of deadly harm ultimately suffered by Mr. Rodgers because they wanted to save money. June Rodgers's son—with whom June Rodgers has a constitutionally guaranteed, substantive due process right to companionship under the Fourteenth Amendment—was slain by one of those criminal defendants because the PSA that judges are required by law to rely on indicated that Mr. Black, Rodger's

killer, had a "low risk" of being a danger to the community, and was released into Ms. Rodgers's neighborhood to terrorize its inhabitants.

107.

Ms. Rodgers is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

**COUNT II**
**PRODUCTS LIABILITY: DESIGN DEFECT**
*(Against Arnold and Milgram)*

108.

Plaintiff hereby incorporates facts 1 through 108 to support this Count II.

109.

Based on the incorporated facts, Arnold Foundation failed to design the PSA that it manufactured such that it was reasonably suitable, fit, or safe for its intended purpose, as evidenced by New Jersey's use of the PSA and the subsequent release of Mr. Black into Mr. Rodgers's neighborhood where Black savagely shot Rodgers 22 times and took his life.

110.

Alternatively, based on the incorporated facts, considering the number of other violent defendants that have been released into New Jersey's communities, the danger presented by Arnold Foundation's PSA is inherent in the product provided to New Jersey because that danger, as a public policy matter, is greater

than can be justified by the PSA's utility in releasing supposedly non-violent offenders and saving the state of New Jersey the expensive costs of incarceration.

111.

Ms. Rodgers is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

**COUNT III**
**PRODUCTS LIABILITY: FAILURE TO WARN**
*(Against Arnold and Milgram)*

112.

Plaintiff hereby incorporates facts 1 through 112 to support this Count III.

113.

Based on the incorporated facts, Arnold Foundation failed to provide the residents of New Jersey with an adequate warning or instruction that its PSA came with severe danger and failed to otherwise communicate adequate information on the dangers and safe use of the product at any time relevant to this Complaint, considering the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used.

114.

The PSA that Arnold provided was a dangerous product, as evidenced by New Jersey's use of the PSA and the subsequent release of Mr. Black into Mr.

Rodgers's neighborhood where Black savagely shot Rodgers 22 times and took his life.

115.

Ms. Rodgers is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

**COUNT IV**
**CLAIM UNDER THE SURVIVOR'S ACT**
**DUE TO NEGLIGENCE OF MANUFACTURER**
*(Against Arnold and Milgram)*

116.

Plaintiff hereby incorporates facts 1 through 116 to support this Count IV.

117.

Based on the incorporated facts, because Arnold Foundation supplies a New Jersey product, its PSA, Arnold Foundation had a duty to use reasonable care to give warning of the dangerous condition of the product or of facts which make it likely to be dangerous to those whom the supplier expected to use the product. After considerable lobbying efforts by Arnold Foundation, under New Jersey's CJRA New Jersey residents have no choice but to use Arnold's PSA, and Arnold failed in its duty to give warning to New Jersey residents of the PSA's dangerous nature. Arnold's failure to fulfill that duty is considered negligence, and that negligence was the proximate cause of Christian Rodgers's violent death.

118.

Ms. Rodgers is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

**COUNT V**
***ALTERNATIVE* CLAIM UNDER THE SURVIVOR'S ACT**
**DUE TO NEGLIGENCE OF MANUFACTURER OF A COMPONENT PART**
*(Against Arnold and Milgram)*

119.

Plaintiff hereby incorporates facts 1 through 119 to support this Count V.

120.

Based on the incorporated facts, Arnold Foundation, as the maker of a component part which was, at the very least, incorporated into the PSA product finished or assembled by the State of New Jersey, had the same duty of care as to such component parts as it would if it were the sole manufacturer of the PSA. As such, Arnold Foundation had a duty to use reasonable care to give warning of the dangerous condition of the product or of facts which make it likely to be dangerous to those whom the supplier expected to use the product. After considerable lobbying efforts by Arnold Foundation, under New Jersey's CJRA New Jersey residents have no choice but to use Arnold's PSA, and Arnold failed in its duty to give warning to New Jersey residents of the PSA's dangerous nature. Arnold's failure to fulfill that duty is considered negligence, and that negligence was the proximate cause of Christian Rodgers's violent death.

121.

Ms. Rodgers is entitled to all damages permissible under controlling law, as well as attorney fees and cost regarding this lawsuit.

**COUNT VI**
**WRONGFUL DEATH ACT**
*(Against Arnold)*

122.

Plaintiff hereby incorporates facts 1 through 122 to support this Count VI.

123.

Based on the incorporated facts, Arnold Foundation, as the maker of the PSA or, at the very least, the maker of a component part which was incorporated into the PSA product finished or assembled by the State of New Jersey, had a duty to use reasonable care to give a warning of the dangerous condition of the PSA or of facts which make it likely to be dangerous to those whom the Arnold expected to use the product. After considerable lobbying efforts by Arnold Foundation, under New Jersey's CJRA New Jersey residents have no choice but to use Arnold's PSA, and Arnold failed in its duty to give warning to New Jersey residents of the PSA's dangerous nature. Arnold's failure to fulfill that duty is considered negligence, and that negligence was the proximate cause of Christian Rodgers's violent death.

124.

As Ms. Rodgers was dependent on Mr. Rodgers's support, Ms. Rodgers suffered damages due to the loss of his life, caused by Arnold. As such, Ms. Rodgers is entitled to all damages permissible under controlling law, including pecuniary damages, as well as attorney fees and cost regarding this lawsuit.

**COUNT VII**
**INJUNCTIVE RELIEF**
*(Against Defendants Christie and Porrino in their official capacities and against Defendant Arnold)*

125.

Plaintiff hereby incorporates facts 1 through 125 to support this Count VII.

126.

Based on the incorporated facts, Plaintiff prays that this Honorable Court issue an injunctive order and permanently enjoin Defendants Christie and Porrino to (1) refrain from using the PSA, (2) order the Pretrial Program and all prosecutors in the state of New Jersey to refrain from using the PSA, (3) modify the PSA such that it includes sufficient criminal offenses, criminal propensities, and all other relevant data in order to prevent its use from releasing dangerous and violent defendants into New Jersey's precious communities.

127.

Alternatively, based on the incorporated facts, Plaintiff prays that this Honorable Court issue an injunctive order and permanently enjoin Arnold from

providing the state of New Jersey access to the PSA until Arnold demonstrates that the PSA is redesigned such that it includes sufficient criminal offenses, criminal propensities, and all other relevant data in order to prevent its use from releasing dangerous and violent defendants into New Jersey's precious communities.

128.

Alternatively, based on the incorporated facts, Plaintiff prays that this Honorable Court declare the CJRA unconstitutional and issue an injunctive order and permanently enjoin Defendant Porrino from enforcing it.

**COUNT VIII**
**PUNITIVE DAMAGES**
(*Against all Defendants individually*)

**Based on the facts alleged in this complaint,** Plaintiff is entitled to punitive damages, under all applicable laws, because, *inter ali*a, Defendants acted with a willful and conscience indifference to the laws that protect Christian Rodgers and June Rodgers's Constitutional rights.

**COUNT IX**
**ATTORNEY FEES**

**Based on the facts alleged in this Complaint,** Ms. Rodgers is entitled to attorney fees, under all applicable laws.

**WHEREFORE**, Ms. Rodgers prays for a trial by jury of twelve and judgment against Defendants as follows:

(a) That process issue and service be had on each Defendant;

(b) That declaratory judgment be granted in favor of Plaintiff against Defendants, jointly and severally, for the injuries of Plaintiff;

(c) That a permanent injunction be ordered declaring the PSA and the CJRA be immediately modified to prevent violent individuals from being released into New Jersey's communities, or, *alternatively*, that the CJRA and its use of the PSA be declared unconstitutional, in whole or in part, and that this Court permanently enjoin Defendants Christie and Porrino from enforcing the CJRA;

(d) That Plaintiff recover, under the New Jersey Wrongful Death Act, all pecuniary damages for the death of her son, including, but not limited to, all expenses of Mr. Rodgers's funeral and all his future earnings that would have supported Ms. Rodgers;

(e) That Plaintiff recover, under the New Jersey Survivor's Act, compensatory damages for the agony, terror, pain, and suffering of her son in the final moments of his life;

(f) That Plaintiff be awarded all other expenses in an amount to be determined at trial, including attorney fees;

(g) That Plaintiff recover all costs of this litigation;

(h) That a jury trial be had on all issues so triable;

(i) Plaintiff have Judgment against Defendant for punitive damages; and

(j) That Plaintiff receives such other and further relief as the Court deems just and proper.

Respectfully submitted on this 31st day of July 2017,

By */s/ Sarah M. Lachman*
Sarah M. Lachman (NJB #161382016)
Nexus Caridades Attorneys Inc.
5 Pennsylvania Plaza
23rd Floor
New York, NY 10001
(540) 448-5346
slachman@nexuscaridades.com

By */s/ Mario B. Williams*
Mario B. Williams (GSB #235254)
*Future Immediate Pro Hac Vice*
Nexus Caridades Attorneys, Inc.
Civil Rights Division
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
Main Office
113 Mill Place Parkway, Suite 105A
Verona, VA 24482
(404) 654.0288 / (404) 592.6225 FAX
mario@goodgeorgialawyer.com
mwilliams@nexuscaridades.com